541 F.Supp. 922 (1982)
Sydell SHAYER, Linda Claire McDaniel, Shirley Albert, Andi Cenedella, Esther Myers, and Ann Reed, Plaintiffs,
v.
Honorable James C. KIRKPATRICK, Secretary of State of Missouri, Defendant.
City of St. Louis, Vincent C. Schoemehl, Jr., and Geraldine Osborn, Intervenors.
and
St. Louis Regional Commerce and Growth Association, James M. O'Flynn, and John H. Poelker, Intervenors.
William OVERSCHMIDT, Adolph Schatzle, Brian Hall, Mickey Brown, George Engelback, Earl Heitmann and Cecil Crutchfield, Plaintiffs,
v.
Hon. James C. KIRKPATRICK, Secretary of State of Missouri, Defendant.
MISSOURI STATE CONFERENCE OF BRANCHES OF the NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE, INC., St. Louis Branch, NAACP, St. Louis County Branch, NAACP, Cape Girardeau Branch, NAACP, Festus-Crystal City Branch, NAACP, Hannibal Branch, NAACP, Malden Branch, NAACP, Mexico Branch, NAACP, Portageville Branch, NAACP, St. Charles Branch, NAACP, Fredda Witherspoon and James DeClue, Plaintiffs,
v.
Honorable Christopher BOND, Governor, and Honorable James C. Kirkpatrick, Secretary of State of the State of Missouri, Defendants.
MISSOURI STATE CONFERENCE OF BRANCHES OF the NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE, INC., Kansas City Branch, NAACP, St. Joseph Branch, NAACP, Jefferson City Branch, NAACP, Columbia Branch, NAACP, Chillicothe Branch, NAACP, Kennett-Dunklin, NAACP, Marshall Branch, NAACP, Joplin Branch, NAACP, Dr. Fredda Witherspoon and Mr. Ommie L. Nelms, Plaintiffs,
v.
Honorable Christopher BOND, Governor, and Honorable James C. Kirkpatrick, Secretary of State of the State of Missouri, Defendants.
Nos. 81-4144-CV-C, 81-4180-CV-C, 81-4196-CV-C and 81-4184-CV-C.
United States District Court, W. D. Missouri, C. D.
January 7, 1982.
*923 *924 Harold L. Fridkin, Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, Kansas City, Mo., for plaintiffs.
John W. Ashcroft, Atty. Gen., Michael H. Finkelstein, Asst. Atty. Gen., Jefferson City, Mo., for defendant.
James J. Wilson, Asst. City Counselor, Carroll J. Donohue, St. Louis, Mo., for intervenors.
Before FLOYD R. GIBSON, Senior Circuit Judge, WANGELIN, Chief District Judge, and SCOTT O. WRIGHT, District Judge.

MEMORANDUM OPINION
FLOYD R. GIBSON, Senior Circuit Judge, joined by SCOTT O. WRIGHT, District Judge.
This is an action in which the court is being asked to redistrict the State of Missouri into nine congressional districts. Missouri is currently divided into ten districts pursuant to the congressional allocation of 1972 and as set forth in Preisler v. Secretary of State, 341 F.Supp. 1158 (W.D.Mo. 1972), aff'd mem. sub nom. Danforth v. Preisler, 407 U.S. 901, 92 S.Ct. 2440, 32 L.Ed.2d 678 (1972). Because of the population count disclosed by the 1980 decennial census, Missouri is now entitled to only nine members in the United States House of Representatives. In accordance with federal constitutional requirements, appropriate federal legislation, and pertinent Missouri statutes and constitutional provisions, Missouri is obligated to divide the state into nine congressional districts. It has failed to enact an apportionment plan.

I. Facts
Shortly after the Missouri General Assembly adjourned its regular session on June 15, 1981, without passing a congressional redistricting bill, actions seeking a court-ordered apportionment plan were filed in both the Eastern and Western Districts of Missouri.
*925 The parties challenged the constitutionality of the existing apportionment (now outdated by the new population figures and decreased allocation of congressional districts); therefore, three-judge courts were established pursuant to 28 U.S.C. § 2284(a) (1976). The same judges were named to each panel. The allegations of an unconstitutional apportionment provide the jurisdictional basis. This court has jurisdiction under 28 U.S.C.A. § 1331 (1981 Supp.) (federal question) and 28 U.S.C. § 1343(a)(3) (Supp. III 1979) (deprivation of constitutional rights). The parties also alleged a violation of 42 U.S.C. § 1983 (Supp. III 1979), which provides for liability for deprivation of constitutional rights.
We determined that according to 28 U.S.C. § 1391(b) (1976) venue was proper only in the Western District. Section 1391(b) allows a claim to be brought only where all defendants reside or where the claim arose. A claim arises where the complained-of acts or omissions of a defendant occur. 92 C.J.S. Venue § 80. The defendant, Honorable James C. Kirkpatrick, Secretary of State, has his offices in the Western District (Jefferson City, Missouri), and his actions relating to elections would occur in the Western District. Therefore, a claim based on his conduct would accrue where his election duties are performed, i.e., the Western District of Missouri. The two cases filed in the Eastern District were transferred to the Western District and consolidated with the actions that were filed in the Western District. All motions to intervene were granted.
We held a hearing on September 28, 1981. Interested persons, both parties and non-parties, were allowed to present plans and suggestions for redistricting. Other plans and suggestions were subsequently filed with the clerk of the court.
In November 1981, the Governor called a special legislative session to consider the congressional redistricting issue. To prevent speculation on the plans of the court from affecting legislative action, we held no hearings and issued no orders while the General Assembly was in session. The General Assembly adjourned its extraordinary session on December 17, 1981, without passing an apportionment plan. Thus, this court is left with the task of providing an apportionment remedy.

II. Propriety of the Three-Judge Court
According to 28 U.S.C. § 2284(a) (1976): "A district court of three judges shall be convened when ... an action is filed challenging the constitutionality of the apportionment of congressional districts ...." The parties alleged a violation of their rights under Article I, § 2 of the United States Constitution. Paragraph 3 of that section reads: "Representatives ... shall be apportioned among the several States which may be included within this Union, according to their respective Numbers ...." Paragraph 1 states: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States ...." Missouri has not enacted a redistricting law consistent with paragraph 3, and failure to do so could result in a deprivation of the right to select representatives, a violation of paragraph 1. Therefore the constitutionality of the present, ten-district apportionment is called into question. It is apparent that the present apportionment plan (based on the 1970 census figures and subsequent allocation of congressional seats) is unconstitutional.

III. The Constitutional Violation
The General Assembly's failure to provide a means for congressional representation would, if unremedied, result in an unconstitutional deprivation of the Article I, § 2, ¶ 1 right of the people to select representatives. Indeed, one authority has called a legislature's failure to reapportion in light of new census figures "patently and obviously unconstitutional." Wright, Miller, and Cooper, Federal Practice and Procedure, § 4235, at 400; see Ryan v. Board of Elections, 661 F.2d 1130, 1135 (7th Cir. 1981). The apportionment ordered in Preisler v. Secretary of State, 341 F.Supp. 1158 (W.D.Mo.1972), is now outmoded and is unconstitutional because it fails to provide a *926 means by which Missouri can choose its nine representatives.
Our next task is to determine the proper remedy.

IV. The Remedy
In formulating the proper remedy, we first note that a declaratory judgment is one permissible remedy. Under 28 U.S.C. § 2201 (Supp. II 1978), that remedy is available in cases of "actual controversy," and 28 U.S.C. § 2202 (1976) allows for further relief based on a declaratory judgment. We are also aware that 42 U.S.C. § 1988 (1976) requires use of the common law when necessary to furnish suitable remedies. That section is applicable to the instant case because it applies to actions brought under 42 U.S.C. § 1983 (Supp. III 1979). See section I, supra.
Beyond these general considerations, we perceive two possible remedies. First, we could draw a court plan. Second, we could have elections at large, either by court order or by dismissal of the actions.
The first option was adopted by the three-judge court in Preisler v. Secretary of State. There the court also found an apportionment unconstitutional. In that case, population shifts disclosed by the 1970 census showed population variances between districts so great as to be unconstitutional. 341 F.Supp. at 1160. To remedy the situation the court invalidated the then-existing apportionment and drew a map which substantially achieved population equality.
A second option would be to order an election at large, or to dismiss the court actions with the assumption that an election at large would be held. The basis for this option would be 2 U.S.C. § 2a(c)(5) (1976), passed in 1929, which reads: "Until a State is redistricted in the manner provided by the law thereof after any apportionment, ... if there is a decrease in the number of Representatives and the number of districts in such State exceeds such decreased number of Representatives, they shall be elected from the State at large."
On the other hand, a statute subsequently enacted in 1967, 2 U.S.C. § 2c (1976), appears to prohibit at-large elections. It reads: "In each State entitled ... to more than one Representative ..., there shall be established by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative ...." The difficulty results from the fact that neither section 2c nor its legislative history makes any reference to repealing section 2a(c)(5). Nevertheless we conclude that the later statute, section 2c, repealed section 2a(c)(5) by implication. We base this conclusion on several factors. First, nothing in section 2c suggests any limitation on its applicability. Second, the floor debate on section 2c[1] indicates that Congress intended to eliminate the possibility of at-large elections, including those in situations where the legislature had failed to enact a plan. The following comments, made by Senators Bayh and Baker, are enlightening:
MR. BAKER: [2 U.S.C. § 2c] strictly provides in a straightforward manner that when there is more than one Member of the House of Representatives from a State, the State must be districted, and the Members may not run at large.
....
MR. BAYH: ... Suppose a State legislature does not do it [redistrict]. Does the Senator not think that, to be consistent, we should say that the Federal court should not be permitted to reapportion a State and let all the legislators run at large?
MR. BAKER: With respectful deference to my colleague, I think not; because I believe that you are then running afoul of the very problem that is created by occasional failure of State legislatures to adhere to the provisions of article I of the Constitution.

*927 ....
MR. BAYH: ... I just wish to make one brief comment in summary, in light of the colloquy.
This will make it mandatory for all Congressmen to be elected by single-Member districts, whether the reapportionment is done by the State legislatures or by a Federal court.
MR. BAKER: That is my understanding.
113 Cong.Rec. 31718-20 (1967). Furthermore, the Senators made clear their distaste for at-large elections. Senator Bayh said: "[W]e know that if [Hawaii and New Mexico] are excluded from the overall coverage, it can pass the House and we can get a prohibition of at-large elections, which we all believe is necessary." Id. at 31719. Senator Baker said: "The concept of single-Member districts for a unique and special reason has been a nonpartisan undertaking by Members on both sides of the aisle." Id. at 34365.[2]
We realize that the court decisions which prompted Congress to enact section 2c were not based on the statute at issue here, section 2a(c)(5). Rather, those court decisions were based on section 2a(c)(1), which provides a remedy when a state fails to redistrict and there is not a change in the number of representatives. However, that remedy, maintenance of the old districts, would usually violate the one man-one vote rule of Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), because of population inequalities. See section V.A.1., infra. Nevertheless, we can see no reason to limit section 2c to the situation where there is a failure to reapportion but there is no change in the number of representatives. The plain language of section 2c suggests no such limitation. Furthermore, there is no reason to think that had Congress considered the situation where the number of representatives is decreased, it would have favored at-large elections in that context. The passages from the floor debate quoted above indicate opposition to at-large elections, rather than opposition to at-large elections prompted by Wesberry.
We also realize that "repeals by implication are not favored." Universal Interpretive Shuttle Corp. v. Washington Metropolitan Area Transit Commission, 393 U.S. 186, 193, 89 S.Ct. 354, 358, 21 L.Ed.2d 334 (1968). Nevertheless, such repeals are not unprecedented. See Gordon v. New York Stock Exchange, 422 U.S. 659, 685, 95 S.Ct. 2598, 2613, 45 L.Ed.2d 463 (1975). It is well settled that when a later statute is inconsistent with an earlier statute, the later one repeals the earlier. United States v. Yuginovich, 256 U.S. 450, 463, 41 S.Ct. 551, 554, 65 L.Ed. 1043 (1921); United States v. Tynen, 78 U.S. (11 Wall.) 88, 92, 20 L.Ed. 153 (1870); see United States v. California, 297 U.S. 175, 188, 56 S.Ct. 421, 426, 80 L.Ed. 567 (1936). Here, the plain language of section 2c is inconsistent with section 2a(c)(5), warranting a finding of repeal by implication.
Therefore, the only appropriate remedy is a court-ordered apportionment. The plan we have adopted is set forth in "Appendix A." We now explain the criteria we used in formulating the plan.

V. Reapportionment Criteria
In drawing the district boundaries we are guided by the United States Constitution, the State of Missouri Constitution, state law, and sound judicial discretion. An explanation of the criteria we have used is in order.

A. Federal Constitutional Requirements

1. Population
Our first obligation is to follow the requirements of the United States Constitution. The only requirement that has expressly been found by the Supreme Court in congressional apportionment is that the population of the districts must be as equal as practicable.
The population standard for congressional districts was announced in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The Court said: "We *928 hold that, construed in its historical context, the command of Art. I, § 2, that Representatives be chosen `by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." Id. at 7-8, 84 S.Ct. at 529-30 (footnotes omitted). Five years later the Court elucidated the "as nearly as practicable" standard in Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). The Court declared: "[T]he command of Art. I, § 2, that States create congressional districts which provide equal representation for equal numbers of people permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." Id. at 531, 89 S.Ct. at 1229. See also White v. Weiser, 412 U.S. 783, 790-91, 93 S.Ct. 2348, 2352-53, 37 L.Ed.2d 335 (1973). The Court expressly rejected a de minimis standard for population deviation.[3] The Court has called population equality "the preeminent, if not the sole, criterion on which to adjudge constitutionality" in congressional reapportionment. Chapman v. Meier, 420 U.S. 1, 23, 95 S.Ct. 751, 764, 42 L.Ed.2d 766 (1975) (dictum).
The command of the Supreme Court is that there must be a reason for every deviation; the deviation must be either unavoidable with the available data, or there must be a permissible policy strong enough to justify the deviation.
The Court in Preisler specifically considered policies offered to justify deviations from the ideal. The following proffered justifications for population variances were found inadequate: (1) avoiding the fragmentation of political subdivisions, including counties and municipalities, (2) avoiding the fragmentation of distinct economic and social interests, (3) the give and take of the legislative process, and (4) compactness of districts. 394 U.S. at 533-36, 89 S.Ct. at 1230-31. The Court said projected population shifts would justify variances, but these projections must be capable of precise documentation. The Court assumed without deciding that districts could be based on the eligible voter population rather than the total population. If that method is chosen, however, it must be applied throughout the state and not be based on haphazard adjustments.[4]
In Weiser, the Supreme Court left open the possibility that a district court could deviate from the ideal population in an attempt to implement as much as possible a plan passed by the legislature. 412 U.S. at 795-97, 93 S.Ct. at 2354-55. There the Court ordered a district court to explain why it had not adopted an apportionment plan based on one passed by the legislature. Id. at 796-97, 93 S.Ct. at 2355-56. The plan adopted by the legislature had been found unconstitutional because the districts were not as equal in population as practicable. Id. at 788, 93 S.Ct. at 2351. The plan adopted by the court disregarded the one passed by the legislature. Id. at 787, 93 S.Ct. at 2351. However, the plan adopted by the court did not achieve population equality as well as the one based on the legislature's plan. Id. at 796, 93 S.Ct. at 2355. Therefore, Weiser does not stand for the proposition that implementation of a legislative plan is more important than population equality. Furthermore, four Justices concurred solely on the population equality issue. Id. at 798, 93 S.Ct. at 2356 (Powell, J., concurring, joined by Burger, C. J., and Rehnquist, J.), id. (Marshall, J., concurring in part.)
In applying the "one man-one vote" rule, we have concentrated solely on population equality. The 1980 decennial census shows *929 that Missouri has a population of 4,916,686, making the mathematical ideal for each district 546,298. We drew boundaries which give the districts populations as close as possible to equal, and we received assistance from demographic experts[5] to bring the population even closer to the ideal. Only one district deviates from the ideal by more than one-tenth of one percent. The variance between the largest and smallest districts is 0.18%. The average variance is 0.054%. We did not consider possible justifications for a population variance because of the lack of reliable data to show population shifts and uncertainty as to what other policies can justify variance.
The plan we are adopting achieves population equality better than any plan submitted to this court and, so far as we can determine, better than any plan proposed in the legislature. The plan suggested by the dissent has a variance between the largest and smallest districts of 1.17%, more than six times as great as that in the plan we have adopted. The average variance is 0.34%, also more than six times as great as in the court plan. Only two of the districts in the dissent's plan (Sixth and Seventh) have a variance smaller than that in the district with the greatest deviation in the majority plan (Fifth). Unless there is a justification for these deviations, the dissent's plan is not constitutional because it does not create districts with populations as equal as is practicable.
The dissent does not address this constitutional requirement, but two possible justifications for the population variances can be read into the dissenting opinion. The first is that the variances resulted from an attempt not to split counties. See p. 948, par. 2, post. Although we agree that this is desirable, at least in rural counties, because it contributes to the efficient administration of elections, see p. 933, infra, it must be secondary to achieving population equality. Kirkpatrick v. Preisler, 394 U.S. at 533-34, 89 S.Ct. at 1230. The other possible justification is that the variance resulted from implementing a legislative plan. See pp. 947-948, post. Even if Weiser would allow a variance for that reason, a proposition not at all clear, p. 928, supra; In re: Illinois Congressional Districts Reapportionment Cases, No. 81 C 3915, slip op. at 12 (N.D.Ill. Nov. 23, 1981), appeal docketed, Nos. 81-1068 and 81-1077 (U.S. Dec. 9 and 10, 1981), it would not apply to the dissent's plan. Weiser dealt with a plan approved by the legislature and later found to be unconstitutional. The dissent's plan is a proposal that was not adopted by either the House or the Senate in the General Assembly. Such a plan can hardly be said to demonstrate any legislative intent other than a rejection of the plan.
The constitutional requirement is that population be as nearly equal as is practicable, and we have achieved this better than any other plan that has been presented to the court or considered by the General Assembly. Because of the population equality requirement, discussion of rewards or punishments for population changes in the old districts is irrelevant.

2. Race
The Supreme Court has also discussed the requirements of the Fourteenth and Fifteenth Amendments regarding minority voting rights. Although these cases have usually dealt with noncongressional apportionment, the questions they raise might be applicable to congressional apportionment, and therefore they deserve our consideration.
The Supreme Court has held that only purposeful discrimination or abridgment of the vote violates the Fifteenth Amendment or the equal protection clause of the Fourteenth Amendment. City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. *930 1490, 64 L.Ed.2d 47 (1980). Although the opinion of the Court was only a four-justice plurality, Justice Stevens concurred on the basis that even invidious discrimination would not necessarily be unconstitutional, id. at 94, 100 S.Ct. at 1514, and Justice White dissented on the grounds that purposeful discrimination was not proved. Id. at 103, 100 S.Ct. at 1520. Only two Justices, Brennan and Marshall, felt that discriminatory impact would make out a constitutional violation. Id. at 94, 100 S.Ct. at 1514 (Brennan, J., dissenting), 103, 100 S.Ct. at 1520 (Marshall, J., dissenting). Thus it is clear that we are under no constitutional duty to draw a black-majority district.[6] This explanation of our criteria dispels any notion that a possible adverse impact on blacks is based on a discriminatory motive.
On the other hand, race can constitutionally be considered. This principle can be discerned from the opinions in United Jewish Organizations v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). Justices White, Stevens, and Rehnquist said that districts with black majorities can deliberately be drawn so long as white voting strength is not unfairly cancelled out. Id. at 165-68, 97 S.Ct. at 1009-11.[7] Justices Stewart and Powell, concurring in the judgment, said that a racial criterion is not unconstitutional per se. Id. at 179-80, 97 S.Ct. at 1016-17.[8] Although lacking a majority opinion, a majority of the Justices in U.J.O. rejected the idea that the Constitution requires color-blind redistricting.
Three months after the U.J.O. decision was announced, the Court suggested in dicta the extent to which a district court must consider race in redistricting. In Connor v. Finch, 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977), the Court remanded a state legislative apportionment to a three-judge court because of population variances. The plan was also challenged as diluting black voting strength. The Supreme Court said in dicta that a court must explain departures from neutral guidelines if the departures have an adverse impact on black voting strength. In order to dispel any notion of invidious discrimination, we have not departed from neutral guidelines.
The bottom line as to our duty regarding black voting strength is that we cannot intentionally dilute it, we canbut need notintentionally preserve it, and we probably cannot intentionally enhance it to the detriment of other groups' voting strength.
We have not attempted to divide Missouri's present black-majority district (the First). Instead, we have increased its geographic size to bring the population to the required amount. We drew a compact district by extending it to natural boundaries (the Missouri River/St. Louis County line on the north and Interstate Highway 44 on the south, connected by a line on the west that runs north-south which generally follows municipal boundaries or census tracts). This neutral approach achieves maximum compactness in the First district and also makes the Second district more compact by not wrapping it around the First district. *931 This neutral approach comports with constitutional requirements.

3. Other Constitutional Criteria
Finally, there is a question as to whether it is constitutional to intentionally discriminate against nonracial voting groups such as religious, ethnic, economic, or political groups. See City of Mobile v. Bolden, 446 U.S. at 86, 100 S.Ct. at 1510. (Stevens, J., concurring); Bush v. Martin, 224 F.Supp. 499, 510 (S.D.Tex.1963), aff'd, 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964), and cases cited therein. We need not resolve the question of the constitutionality of discrimination against these groups because we are not deviating from neutral standards.

B. Missouri Constitutional Requirements
The next legal standard is that imposed by the Missouri Constitution: "[Congressional] districts shall be composed of contiguous territory as compact and as nearly equal in population as may be." Mo.Const. art. 3, § 45. We respect the additional standard of compactness as a matter of law as well as of comity.[9]White v. Weiser, 412 U.S. at 795, 93 S.Ct. at 2354; Preisler v. Secretary of State, 341 F.Supp. at 1161; see Reynolds v. Sims, 377 U.S. 533, 584, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964).
Determining whether a particular plan meets the state requirements can be difficult. No state appellate court has interpreted the words "compact" and "contiguous" in this section. We therefore look to the construction of those word in the sections of the constitution relating to apportionment of the Missouri House of Representatives, Mo.Const. art. 3, § 2, and the Senate. Id. at § 5. Although there are no appellate cases construing the words relating to the House, there are cases which have construed them regarding state Senate apportionment. The Missouri Supreme Court has read the words as prohibiting "gerrymandering," long and narrow strips, and "branches," while requiring districts to be composed of "closely united territory." Preisler v. Doherty, 365 Mo. 460, 284 S.W.2d 427, 433-35 (1955). See also State v. Hitchcock, 241 Mo. 433, 146 S.W. 40 (1912). In both of these cases, apportionment plans were invalidated. 284 S.W.2d at 437; 146 S.W. at 65.
Neither of these cases, nor others construing the words, see, e.g., Preisler v. Kirkpatrick, 528 S.W.2d 422 (Mo. banc 1975); Preisler v. Hearnes, 362 S.W.2d 552 (Mo. banc 1962), gives us guidance as to the outer limits of compactness and contiguity, although they do indicate a willingness on the part of Missouri courts to invalidate plans for failure to meet these standards. Furthermore, we do not know whether those words would be given an identical meaning as related to congressional apportionment.
It is important that our plan adhere to the requirements of the Missouri Constitution; if it were to be invalidated by a state court because it failed to meet the compactness requirement, the state would be in a quagmire regarding the election of its congressional representatives. Just the existence of lengthy litigation on the issue would be harmful. While we cannot prevent litigation, we can endeavor to lessen the probability of legal challenges by adhering to state constitutional and legal requirements where such requirements do not intrude on the commands of the United States Constitution. In fact, we are obligated to do so. White v. Weiser, 412 U.S. at 795, 93 S.Ct. at 2354.
Therefore, we strived not simply for legally sufficient compact and contiguous districts; we drew the most compact and contiguous districts we could, given the considerations involved and the weight of the various factors that go to make up the equation. We drew compact districts by blocking a district out from each of the four corners of the state until the proper population *932 was reached, by concentrating one district in the Kansas City area,[10] and by concentrating three districts in four counties in the St. Louis area, where there are 149,610 people more than enough for three districts.[11] The last district is composed of the remaining area in the western part of the state. Complete compactness is lacking only because of our desire not to split rural counties, p. 933, infra, while achieving population equality.
On the other hand, the dissent's plan is not compact. A "finger" in the Eighth district probes into St. Louis County to secure approximately 144,000 of the required population. There are unnecessary irregular lines between the Ninth and Second districts as the Ninth dips into two separate parts of St. Louis County. We do not think it is proper for a federal court to give so little regard to the state constitutional requirement of compactness when that requirement does not conflict with federal law.

C. Policy Considerations
Within these legal constraints there are, of course, many plans which could be devised. We now set forth those criteria which we believe are most appropriate for a court.

1. Legislative Practices
Because reapportionment is primarily a legislative function, we must follow the policies and preferences of the state in fashioning an apportionment plan. Connor v. Finch, 431 U.S. at 414-15, 97 S.Ct. at 1833-34; White v. Weiser, 412 U.S. at 795, 93 S.Ct. at 2354, and cases cited therein. We did not want to intrude upon state policies any more than necessary to meet constitutional requirements. Whitcomb v. Chavis, 403 U.S. 124, 160-61, 91 S.Ct. 1858, 1877-78, 29 L.Ed.2d 363 (1971). Adhering to state policies is a way in which we can give effect to the will of the majority of the people of Missouri. Preisler v. Secretary of State, 341 F.Supp. at 1161. Other than the state constitution's compact and contiguous requirements, state policies are difficult to discern. Following them is not required by state law, so we have given the compact and contiguous requirements preeminence over all other state policies.
The state legislature's own work on apportionment can be indicative of state policy. When a state enacts apportionment legislation which is later declared unconstitutional, a court which fashions a remedy by drawing its own plan should follow the legislature's version as much as is constitutionally possible. White v. Weiser, 412 U.S. at 795-97, 93 S.Ct. at 2354-55; Preisler v. Secretary of State, 341 F.Supp. at 1161. In the instant case, however, we are being asked to apportion because no bill has been passed.
As an alternative, we could look to legislative proposals to attempt to discern a state policy. The further a bill goes in the legislative process (e.g., out of committee, passed by one house, passed by both houses but vetoed) the more it evidences a legislative policy. See Skolnick v. State Electoral Board, 336 F.Supp. 839, 846 (N.D. Ill.1971). On the other hand, the failure of a bill to be enacted evidences a legislative policy that the bill is not desired by the legislature. Therefore, we cannot simply embrace as our own the bill that went the furthest or that experts believe would have or could have passed. Such action would be a massive intrusion into the legislative process. We would, in effect, be amending the rules for enacting legislation. Although political scientists may argue over the extent to which the legislative process reflects the will of the people, we must take the procedures as we find them.
*933 This does not mean that all legislative proposals are useless. To the extent the proposals which came closest to passing have common elements, we have tried to incorporate those elements into our plan. However, plans considered by the General Assembly were so different from one another that extracting common elements is difficult. Furthermore, even when some general common elements can be discerned, they are hard to apply. The specific application of these elements will often have ramifications on the entire plan, which caused the dispute and present stalemate in the General Assembly.
Another indication of a state policy is the state's historical practices regarding apportionment. See Connor v. Finch, 431 U.S. at 419, 424, 97 S.Ct. at 1836, 1838. We have adhered to these practices to the extent possible. However, these practices are not always easy to discern or apply.
Prior apportionments are of little help. Missouri was divided into ten districts under the 1970 census. Legislative debate has centered on where to eliminate a district. The old plan, therefore, is of little help. Furthermore, that plan was drafted by a court, reducing its usefulness for reflecting legislative intent.[12]
One historical practice is that of not bisecting rural counties. Although this goal is secondary to population equality, Kirkpatrick v. Preisler, 394 U.S. at 533-34, 89 S.Ct. at 1230-31, we feel we can reasonably adhere to this practice. Respecting political subdivisions is a proper judicial approach to apportionment. Skolnick v. State Electoral Board, 336 F.Supp. at 843.
We are also mindful of the admonition of the Supreme Court in Kirkpatrick v. Preisler, 394 U.S. at 533-34, 89 S.Ct. at 1230: "[W]e do not find legally acceptable the argument that variances are justified if they necessarily result from a State's attempt to avoid fragmenting political subdivisions by drawing congressional district lines along existing county, municipal, or other political subdivision boundaries." However, we have attempted to not disturb county boundaries except where necessary to achieve approximate equality of population, because all of the evidence adduced in the case was that the splitting of counties can cause innumerable administrative problems and additional costs in holding elections, along with confusion among voters in the split counties. While we read the Supreme Court cases as being basically concerned with population and as demanding a population distribution as near to the quotient as is practicably possible under the prevailing circumstances, we do believe that minor deviations based on preserving definitive county and political subdivisions are permissible within very narrow limits.
We also note that historically the City of St. Louis has been divided into two districts. We realize that until the 1980 census, the official population of the City of St. Louis was greater than that necessary for one congressional district. However, in the past both districts in the City of St. Louis extended into St. Louis County, indicating that more than numerical necessity caused the division. Legislative proposals conflicted on whether to divide the City of St. Louis. This is unfortunate, because whether or not the city is divided has almost no ramifications on the rest of the plan, and therefore if legislative proposals had been in agreement we could have adopted the approach in these proposals. Because the proposals conflict on this issue, we rely on the previous state policy of dividing the City of St. Louis. We chose as the dividing line a "natural" boundary, an interstate highway near the center of the city.[13]
We realize that we could be criticized for dividing the City of St. Louis in light of its population. The city's population is 453,085, *934 which is 93,213 less than enough for one district. If the city were not divided, it would have 83% of the population of the district in which it is located. Dividing the City of St. Louis has given it a minority of the population in two districts (48% in the First and 35% in the Third). Arguably, its vote has been diluted. Nevertheless, we are not interested in preserving or diluting a particular area's strength. We have divided the City of St. Louis because of the prior state policy of doing so.

2. Other policies
Because state policies as to apportionment are largely inconclusive, we are guided primarily by equality of population and compactness.
We have given consideration to the expressions of political and civic bodies and individuals which have been brought to the attention of this court. Of course, sentiment may conflict within a community and between communities, limiting the usefulness of such expressions.
The divergent interests which are most directly reflected in geographic distributions are those between rural and urban areas. We do not mean to suggest that all rural interests are identical; rather, we believe that the differences among various rural interests are less than the differences between any rural interest and an urban interest. These varied interests are secondary to the compactness requirement of the Missouri Constitution. Indeed, grouping of urban interests is to some extent necessary to meet the compactness requirement.
Census figures show that the population of the St. Louis Standard Metropolitan Statistical Area is 1,788,504, or 149,610 more than enough to completely fill three districts. The population of the Kansas City Standard Metropolitan Statistical Area is 884,502, or 338,204 more than enough for one district, and 208,094 less than enough to completely fill two districts. There would be no reason to have fewer than four completely urban districts, or 44.4 percent of the districts. The urban population of Missouri is 54.4 percent of the state's population, and five urban districts would give the urban areas 55.6 percent of the representatives.

D. Summary
Our criteria in reapportionment are, in order of importance: (1) achieving population equality, (2) drawing compact and contiguous districts, and (3) implementing state policies on apportionment, including not bisecting rural counties.

VI. Conclusion
We regret that we were unable to reach a unanimous decision. However, the plan espoused by our esteemed brother does not comport with the federal constitutional requirement of population equality and does not appear to comply with the Missouri constitutional requirement of compactness. We therefore adopt the plan appended to this opinion and marked "Appendix A." The 1980 census population figures of the judicially approved congressional districts are as follows:

 UNITED STATES CONGRESSIONAL DISTRICTS
 VARIANCE FROM IDEAL DISTRICT
DISTRICT POPULATION POPULATION PERCENT
 1 546,208 90 .02%
 2 546,039 259 .05%
 3 546,102 196 .04%
 4 546,637 339 .06%
 5 546,882 584 .11%
 6 546,614 316 .06%
 7 545,921 377 .07%

*935
 VARIANCE FROM IDEAL DISTRICT
DISTRICT POPULATION POPULATION PERCENT
 8 546,112 186 .03%
 9 546,171 127 .02%
 _______
State
Population 4,916,686
Ideal district population: 546,298
Largest district: District 5 546,882
Smallest district: District 7 545,921
Average percent variance of districts from ideal size: .05%
Variance between smallest and largest district: .18%

For the foregoing reasons, it is ORDERED, ADJUDGED, AND DECLARED that the congressional apportionment set forth in Preisler v. Secretary of State, 341 F.Supp. 1158 (W.D.Mo.1972), is unconstitutional. It is further
ORDERED AND ADJUDGED that congressional election processes and congressional primary and general elections in 1982 and thereafter be conducted in and from the congressional districts established in this judgment and by Appendix A unless and until a timely new congressional redistricting act enacted by the State of Missouri takes effect. In the event there is a conflict in Appendix A between, on the one hand, the census tract and county descriptions, and, on the other, the boundary lines as shown on the appended maps, the maps shall control. In particular, the line between the First and Third districts is the middle of the present location of Interstate Highway 44, and after it reaches Interstate Highway 55 in the eastern part of the city, the center of Interstate Highway 55 is the dividing line. The State of Missouri Office of Administration shall provide the Secretary of State with maps which detail the maps set forth in Appendix A. It is further
ORDERED AND ADJUDGED that this court retain jurisdiction to implement, enforce, and amend this judgment as shall be meet and just and in accordance with the 1980 census figures.

APPENDIX "A"

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF MISSOURI CENTRAL DIVISION
In Civil Actions No. 81-4144, 81-4180, 81-4196, and 81-4184, the court's redistricting plan for Missouri is set forth in words and figures, as follows:

CONGRESSIONAL DISTRICT NUMBER 1
Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

 1980
 POPULATION
St. Louis County (part)
 Census Tract 2101 6,622
 Census Tract 2102 6,899
 Census Tract 2103 4,153
 Census Tract 2104 4,191
 Census Tract 2105 9,971
 Census Tract 2106 7,513
 Census Tract 2107 14,445
 Census Tract 2108.02 14,620
 Census Tract 2108.03 5,194
 Census Tract 2108.04 7,065
 Census Tract 2109.01 6,890
 Census Tract 2117 4,559
 Census Tract 2118 9,605
 Census Tract 2119 5,593
 Census Tract 2120 12,358
 Census Tract 2121 9,279
 Census Tract 2122 10,695
 Census Tract 2123 5,627
 Census Tract 2124 2,711

*936
 1980
 POPULATION
 Census Tract 2125 5,427
 Census Tract 2126 5,066
 Census Tract 2127 9,779
 Census Tract 2136 6,088
 Census Tract 2137 7,352
 Census Tract 2138 8,847
 Census Tract 2139 2,874
 Census Tract 2140 1,183
 Census Tract 2141 1,971
 Census Tract 2142 4,236
 Census Tract 2143 4,803
 Census Tract 2157 7,733
 Census Tract 2158 7,546
 Census Tract 2159 9,120
 Census Tract 2160 2,363
 Census Tract 2161 6,966
 Census Tract 2162 9,010
 Census Tract 2163 5,577
 Census Tract 2164 5,576
 Census Tract 2165 3,408
 Census Tract 2167 4,529
 Census Tract 2168 4,103
 Census Tract 2169 2,823
 Census Tract 2170 3,810
 Census Tract 2171 1,372
 Census Tract 2172 2,955
 Census Tract 2173 (part)
 Jefferson Township (part)
 Brentwood (part)
 Block Group 1 521
 Block Group 2 797
 Block Group 3 (part)
 Blocks 301-302 63
 Blocks 307-312 293
 Block Group 4 997
 St. Louis City (part)
 Census Tract 1034 (part)
 Block Group 1 (part)
 Blocks 117-118 63
 Block Group 3 (part)
 Block 320 17
 Census Tract 1036 (part)
 Block Group 1 (part)
 Blocks 104-120 277
 Census Tract 1038 (part)
 Block Group 5 (part)
 Block 522 0
 Census Tract 1039 (part)
 Block Group 1 381
 Block Group 2 407
 Block Group 3 (part)
 Blocks 307-324 466
 Blocks 344-348 87
 Census Tract 1041 3,462
 Census Tract 1042 4,325
 Census Tract 1045 2,817
 Census Tract 1051 4,286
 Census Tract 1052 2,871
 Census Tract 1053 4,013
 Census Tract 1054 3,564
 Census Tract 1055 6,296
 Census Tract 1061 5,854
 Census Tract 1062 4,129
 Census Tract 1063 5,346
 Census Tract 1064 4,863
 Census Tract 1065 5,020
 Census Tract 1066 4,353
 Census Tract 1067 5,847
 Census Tract 1071 1,272
 Census Tract 1072 2,779
 Census Tract 1073 8,902
 Census Tract 1074 6,112
 Census Tract 1075 5,550
 Census Tract 1076 3,845
 Census Tract 1077 5,700
 Census Tract 1081 4,144
 Census Tract 1082 3,154
 Census Tract 1083 2,684
 Census Tract 1084 1,348
 Census Tract 1085 1,069
 Census Tract 1096 5,846
 Census Tract 1097 7,592
 Census Tract 1101 5,619
 Census Tract 1102 5,254
 Census Tract 1103 5,092
 Census Tract 1104 5,046
 Census Tract 1105 4,103
 Census Tract 1111 4,341
 Census Tract 1112 4,517
 Census Tract 1113 3,869
 Census Tract 1114 4,625
 Census Tract 1115 2,909
 Census Tract 1121 4,055
 Census Tract 1122 4,017
 Census Tract 1123 4,345
 Census Tract 1124 4,487
 Census Tract 1135 (part)
 Block Group 2 (part)
 Block 209 91
 Block Group 5 (part)
 Blocks 503-505 125
 Block 521 186
 Block Group 6 (part)
 Block 610 0
 Blocks 620-623 98

*937
 1980
 POPULATION
 Census Tract 1171 (part)
 Block Group 1 (part)
 Blocks 101-102 242
 Block Group 4 (part)
 Blocks 405-406 0
 Census Tract 1172 (part)
 Block Group 1 (part)
 Blocks 101-105 1,098
 Block 119 0
 Block Group 7 (part)
 Blocks 705-706 515
 Block 716 0
 Census Tract 1173 (part)
 Block Group 1 618
 Block Group 3 (part)
 Blocks 317-318 196
 Block 320 23
 Block Group 4 (part)
 Block 423 0
 Block Group 6 1,443
 Block Group 7 844
 Census Tract 1181 2,872
 Census Tract 1184 1,466
 Census Tract 1185 1,437
 Census Tract 1186 3,364
 Census Tract 1191 6,303
 Census Tract 1192 2,624
 Census Tract 1193 3,829
 Census Tract 1201 2,040
 Census Tract 1202 2,193
 Census Tract 1203 3,240
 Census Tract 1211 4,806
 Census Tract 1212 3,989
 Census Tract 1213 2,702
 Census Tract 1214 344
 Census Tract 1221 1,469
 Census Tract 1222 (part)
 Block Group 1 (part)
 Block 105 0
 Block 114 3
 Block 125 0
 Blocks 127-140 5
 Blocks 150-153 0
 Block Group 2 4
 Block Group 3 85
 Census Tract 1224 (part)
 Block Group 2 13
 Block Group 3 50
 Block Group 4 2,487
 Block Group 5 310
 Block Group 6 2,032
 Census Tract 1231 (part)
 Block Group 1 183
 Block Group 2 78
 Block Group 3 (part)
 Blocks 301-302 0
 Block 317 178
 Census Tract 1232 (part)
 Block Group 1 986
 Block Group 2 (part)
 Blocks 202-203 31
 Blocks 220-221 72
 Block Group 3 (part)
 Blocks 305-306 116
 Block 316 59
 Block Group 4 419
 Census Tract 1234 (part)
 Block Group 2 120
 Block Group 3 (part)
 Block 301 7
 Block 305 0
 Block 331 0
 Census Tract 1255 2,323
 Census Tract 1256 1,127
 Census Tract 1257 3,340
 Census Tract 1266 4,620
 Census Tract 1267 3,205
 _____
TOTAL 546,208

CONGRESSIONAL DISTRICT NUMBER 2
Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

 1980
 POPULATION
St. Charles County (part)
 Census Tract 3102 4,744
 Census Tract 3103 9,475
 Census Tract 3104 2,667
 Census Tract 3105 7,977
 Census Tract 3106 7,941
 Census Tract 3107 5,538
 Census Tract 3108 4,959
 Census Tract 3109 4,487
 Census Tract 3110 5,074
 Census Tract 3112 12,323
St. Louis County (part)
 Census Tract 2109.02 12,736
 Census Tract 2109.03 9,427
 Census Tract 2110 9,352
 Census Tract 2111 12,883
 Census Tract 2112 10,149
 Census Tract 2113.01 8,330
 Census Tract 2113.02 6,836
 Census Tract 2113.03 14,978
 Census Tract 2114.01 5,158
 Census Tract 2114.02 2,019
 Census Tract 2115 4,586
 Census Tract 2116 7,800
 Census Tract 2128 4,744
 Census Tract 2129 5,539
 Census Tract 2130 856
 Census Tract 2131.01 8,798
 Census Tract 2131.02 3,206

*938
 Census Tract 2132.01 7,467
 Census Tract 2132.02 7,459
 Census Tract 2133 9,015
 Census Tract 2134 8,654
 Census Tract 2135 5,876
 Census Tract 2144 6,148
 Census Tract 2145 3,678
 Census Tract 2146 9,898
 Census Tract 2147 8,311
 Census Tract 2148 6,578
 Census Tract 2149 6,548
 Census Tract 2150.01 3,016
 Census Tract 2150.02 6,757
 Census Tract 2150.03 4,662
 Census Tract 2151.01 10,145
 Census Tract 2151.02 5,194
 Census Tract 2151.03 3,027
 Census Tract 2151.04 9,553
 Census Tract 2151.05 1,999
 Census Tract 2152.01 6,533
 Census Tract 2152.02 6,444
 Census Tract 2152.03 9,994
 Census Tract 2153.01 4,267
 Census Tract 2153.02 3,463
 Census Tract 2154 5,666
 Census Tract 2155 5,055
 Census Tract 2156 5,198
 Census Tract 2166 2,884
 Census Tract 2173 (part)
 Jefferson Township (part)
 Brentwood (part)
 Block Group 3 (part)
 Blocks 303-306 485
 Census Tract 2174 4,523
 Census Tract 2175 5,925
 Census Tract 2176 7,786
 Census Tract 2177.01 4,362
 Census Tract 2177.02 7,231
 Census Tract 2178.02 8,694
 Census Tract 2178.04 9,775
 Census Tract 2178.05 7,512
 Census Tract 2178.06 5,955
 Census Tract 2178.07 7,124
 Census Tract 2179.02 10,567
 Census Tract 2179.03 8,684
 Census Tract 2179.04 7,042
 Census Tract 2180.01 7,916
 Census Tract 2180.02 5,361
 Census Tract 2181 3,279
 Census Tract 2182 4,505
 Census Tract 2183 4,408
 Census Tract 2184 9,080
 Census Tract 2185 4,985
 Census Tract 2186 2,848
 Census Tract 2187 1,728
 Census Tract 2188 6,035
 Census Tract 2189 6,098
 Census Tract 2193 (part)
 Jefferson Township (part)
 Webster Groves (part)
 Block Group 2 (part)
 Blocks 204-216 616
 Block Group 3 699
 Census Tract 2114.02 9,447
 Census Tract 2215 8,777
 Census Tract 2216 8,521
 _____
TOTAL 546,039

CONGRESSIONAL DISTRICT NUMBER 3
Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

 1980
 POPULATION
Jefferson County 146,183
St. Louis County (part)
 Census Tract 2190 1,355
 Census Tract 2191 4,417
 Census Tract 2192 2,715
 Census Tract 2193 (part)
 Jefferson Township (part)
 Webster Groves (part)
 Block Group 1 764
 Block Group 2 (part)
 Blocks 201-203 186
 Census Tract 2194 5,941
 Census Tract 2195 6,538
 Census Tract 2196 5,071
 Census Tract 2197 6,502
 Census Tract 2198 8,264
 Census Tract 2199 6,655
 Census Tract 2200 9,546
 Census Tract 2201 9,200
 Census Tract 2202 7,492
 Census Tract 2203 1,743
 Census Tract 2204.02 10,557
 Census Tract 2204.03 9,885
 Census Tract 2204.04 12,343

*939
 1980
 POPULATION
 Census Tract 2205 13,860
 Census Tract 2206.01 5,440
 Census Tract 2206.02 5,947
 Census Tract 2207.01 3,111
 Census Tract 2207.02 4,380
 Census Tract 2207.03 3,269
 Census Tract 2208.01 6,129
 Census Tract 2208.02 5,628
 Census Tract 2208.03 5,337
 Census Tract 2209 2,934
 Census Tract 2210 3,930
 Census Tract 2211 1,851
 Census Tract 2212.01 2,248
 Census Tract 2212.02 5,955
 Census Tract 2213.01 7,541
 Census Tract 2213.02 6,742
 Census Tract 2213.03 8,640
 Census Tract 2214.01 5,748
St. Louis City (part)
 Census Tract 1011 3,270
 Census Tract 1012 3,756
 Census Tract 1013 4,966
 Census Tract 1014 3,447
 Census Tract 1015 4,116
 Census Tract 1018 4,260
 Census Tract 1018.99 50
 Census Tract 1021 3,035
 Census Tract 1022 7,127
 Census Tract 1023 2,274
 Census Tract 1024 2,648
 Census Tract 1025 2,248
 Census Tract 1031 3,621
 Census Tract 1034 (part)
 Block Group 1 (part)
 Blocks 101-116 970
 Block Group 2 963
 Block Group 3 (part)
 Block 301 120
 Block 319 156
 Block 321 49
 Census Tract 1036 (part)
 Block Group 1 (part)
 Block 121 96
 Block Group 2 470
 Block Group 3 864
 Census Tract 1037 3,171
 Census Tract 1038 (part)
 Block Group 1 795
 Block Group 2 961
 Block Group 3 749
 Block Group 4 912
 Block Group 5 (part)
 Blocks 506-521 684
 Block 523 52
 Block Group 6 316
 Census Tract 1039 (part)
 Block Group 3 (part)
 Block 343 31
 Census Tract 1131 4,385
 Census Tract 1134 1,185
 Census Tract 1135 (part)
 Block Group 1 142
 Block Group 2 (part)
 Blocks 201-208 662
 Block Group 3 716
 Block Group 4 657
 Block Group 5 (part)
 Blocks 509-511 179
 Blocks 522-524 210
 Block Group 6 (part)
 Blocks 607-608 87
 Census Tract 1141 9,590
 Census Tract 1142 5,569
 Census Tract 1143 6,449
 Census Tract 1151 3,942
 Census Tract 1152 3,172
 Census Tract 1153 6,358
 Census Tract 1154 3,327
 Census Tract 1155 6,331
 Census Tract 1156 6,116
 Census Tract 1157 4,390
 Census Tract 1161 3,338
 Census Tract 1162 5,937
 Census Tract 1163 7,169
 Census Tract 1164 5,379
 Census Tract 1165 5,295
 Census Tract 1171 (part)
 Block Group 1 (part)
 Blocks 103-109 624
 Block Group 2 672
 Block Group 3 764
 Block Group 4 (part)
 Blocks 401-404 0
 Census Tract 1172 (part)
 Block Group 1 (part)
 Blocks 108-109 439
 Block Group 2 874
 Block Group 3 954
 Block Group 4 1,255
 Block Group 5 1,406
 Block Group 6 1,411
 Block Group 7 (part)
 Blocks 701-702 223
 Census Tract 1173 (part)
 Block Group 3 (part)
 Blocks 301-307 470
 Block 319 30
 Block 321 103
 Block Group 4 (part)
 Blocks 407-422 606

*940
 1980
 POPULATION
 Block 424 171
 Census Tract 1174 5,576
 Census Tract 1222 (part)
 Block Group 1 (part)
 Blocks 102-103 0
 Blocks 109-113 0
 Blocks 116-124 0
 Block 154 9
 Census Tract 1224 (part)
 Block Group 1 0
 Census Tract 1231 (part)
 Block Group 3 (part)
 Blocks 304-307 573
 Blocks 318-320 278
 Block Group 4 1,255
 Block Group 5 270
 Block Group 6 305
 Block Group 7 1,280
 Census Tract 1232 (part)
 Block Group 2 (part)
 Block 201 0
 Block 205 0
 Blocks 207-210 76
 Block 219 0
 Block Group 3 (part)
 Blocks 301-302 268
 Block 317 2
 Block Group 5 835
 Census Tract 1233 3,672
 Census Tract 1234 (part)
 Block Group 1 15
 Block Group 3 (part)
 Blocks 312-321 289
 Block 332 106
 Block Group 4 469
 Block Group 5 372
 Block Group 6 524
 Block Group 7 296
 Block Group 8 238
 Census Tract 1235 0
 Census Tract 1241 6,287
 Census Tract 1242 4,526
 Census Tract 1243 5,209
 Census Tract 1246 2,561
 _____
TOTAL 546,102

CONGRESSIONAL DISTRICT NUMBER 4
Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

 1980
 POPULATION
Barton County 11,292
Bates County 15,873
Benton County 12,183
Camden County 20,017
Cass County 51,029
Cole County 56,663
Henry County 19,672
Hickory County 6,367
Jackson County (part)
 Census Tract 113 (part)
 Blue Township (part)
 Independence (part)
 Block Group 1 (part)
 Blocks 116-136 1,800
 Census Tract 114.01 (part)
 Blue Township (part)
 Independence (part)
 Block Group 1 (part)
 Blocks 101-102 7
 Blocks 115-117 241
 Block Group 9 4,205
 Census Tract 114.03 (part)
 Blue Township (part)
 Independence (part)
 Block Group 1 2,706
 Block Group 2 942
 Block Group 3 (part)
 Blocks 301-308 373
 Blocks 313-324 2,730
 Block Group 9 2,106
 Census Tract 114.04 2,495
 Census Tract 135 (part)
 Prairie Township (part)
 Remainder of Township 184
 Census Tract 138 3,870
 Census Tract 139 5,889
 Census Tract 140 7,243
 Census Tract 141.01 5,050
 Census Tract 141.02 11,825
 Census Tract 141.03 8,188
 Census Tract 142.02 197
 Census Tract 145 (part)
 Blue Township (part)
 Independence (part)
 Block Group 9 (part)
 Block 907 1
 Block 918 45
 Sni-A-Bar Township (part) 508
 Census Tract 147 4,005
 Census Tract 148.01 560
 Census Tract 148.02 735
 Census Tract 149 8,351
 Census Tract 150 (part)
 Fort Osage Township (part)
 Buckner (part) 1,133
 Levasy (part) 165
 Census Tract 151 (part)
 Blue Township (part)
 Independence (part)
 Block Group 9 288
 Sugar Creek (part)
 Block Group 9 (part)
 Block 901 28
 Block 908 34

*941
 1980
 POPULATION
 Blocks 910-914 27
 Block 984 0
 Block 986 23
 Remainder of Township (part)
 Block Group 2 46
 Block Group 9 (part)
 Blocks 901-924 335
 Blocks 926-954 3,872
 Blocks 985-989 182
Johnson County 39,059
Laclede County 24,323
Lafayette County 29,925
Maries County 7,551
Miller County 18,532
Moniteau County 12,068
Morgan County 13,807
Pettis County 36,378
Pulaski County 42,011
St. Clair County 8,622
Texas County 21,070
Vernon County 19,806
 ______
TOTAL 546,637

CONGRESSIONAL DISTRICT NUMBER 5
Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

 1980
 POPULATION
Jackson County (part)
 Census Tract 1 0
 Census Tract 2 50
 Census Tract 3 2,025
 Census Tract 4 811
 Census Tract 5.01 182
 Census Tract 5.02 1,263
 Census Tract 6 4,361
 Census Tract 7 4,023
 Census Tract 8 4,131
 Census Tract 9 3,632
 Census Tract 10 3,516
 Census Tract 11 1,948
 Census Tract 12 590
 Census Tract 13 1,619
 Census Tract 14 816
 Census Tract 15 1,437
 Census Tract 16 1,988
 Census Tract 17 2,746
 Census Tract 18 3,958
 Census Tract 19 3,943
 Census Tract 20 2,315
 Census Tract 21 4,886
 Census Tract 22 3,589
 Census Tract 23 2,113
 Census Tract 24 1,399
 Census Tract 25 1,777
 Census Tract 26 28
 Census Tract 27 10
 Census Tract 28.01 80
 Census Tract 28.02 69
 Census Tract 29 1,212
 Census Tract 30 2,363
 Census Tract 31 175
 Census Tract 32 1,059
 Census Tract 33 1,543
 Census Tract 34 3,956
 Census Tract 35.01 1,723
 Census Tract 35.02 916
 Census Tract 36.01 1,212
 Census Tract 36.02 2,218
 Census Tract 37 2,207
 Census Tract 38 2,181
 Census Tract 39 1,716
 Census Tract 40 1,770
 Census Tract 41 989
 Census Tract 42 1,642
 Census Tract 43 2,925
 Census Tract 44 1,030
 Census Tract 45 969
 Census Tract 46 3,162
 Census Tract 47 1,201
 Census Tract 48 3,050
 Census Tract 49 2,686
 Census Tract 50 3,114
 Census Tract 51 2,256
 Census Tract 52 2,623
 Census Tract 53 2,398
 Census Tract 54 2,162
 Census Tract 55 1,927
 Census Tract 56.01 2,974
 Census Tract 56.02 3,138
 Census Tract 57 3,696
 Census Tract 58.01 3,880
 Census Tract 58.02 5,045
 Census Tract 59.01 954
 Census Tract 59.02 2,760
 Census Tract 60 2,480
 Census Tract 61 4,662
 Census Tract 62 2,211
 Census Tract 63 3,414
 Census Tract 64 2,773
 Census Tract 65 1,927

*942
 1980
 POPULATION
 Census Tract 66 2,185
 Census Tract 67 2,928
 Census Tract 68 1,004
 Census Tract 69 1,891
 Census Tract 70 3,209
 Census Tract 71 3,178
 Census Tract 72 2,149
 Census Tract 73 4,270
 Census Tract 74 4,678
 Census Tract 75 4,363
 Census Tract 76 4,307
 Census Tract 77 2,862
 Census Tract 78.01 1,094
 Census Tract 78.02 3,071
 Census Tract 79 5,682
 Census Tract 80 4,388
 Census Tract 81 3,418
 Census Tract 82 3,219
 Census Tract 83 2,721
 Census Tract 84 3,010
 Census Tract 85 3,581
 Census Tract 86 5,871
 Census Tract 87 3,963
 Census Tract 88 5,523
 Census Tract 89 2,828
 Census Tract 90 5,623
 Census Tract 91 4,269
 Census Tract 92 3,137
 Census Tract 93 2,794
 Census Tract 94 5,134
 Census Tract 95 3,885
 Census Tract 96 2,019
 Census Tract 97 1,140
 Census Tract 98 3,954
 Census Tract 99 2,714
 Census Tract 100.01 1,626
 Census Tract 100.02 2,973
 Census Tract 101.03 2,832
 Census Tract 101.04 777
 Census Tract 101.05 2,815
 Census Tract 101.06 2,715
 Census Tract 102.01 2,178
 Census Tract 102.03 5,084
 Census Tract 102.04 4,022
 Census Tract 103.01 655
 Census Tract 103.02 4,221
 Census Tract 104.01 1,441
 Census Tract 104.02 771
 Census Tract 105 5,835
 Census Tract 106 3,428
 Census Tract 107.01 1,402
 Census Tract 107.02 2,415
 Census Tract 108.01 1,405
 Census Tract 108.02 4
 Census Tract 109.01 2,583
 Census Tract 109.02 900
 Census Tract 110 5,847
 Census Tract 111 4,170
 Census Tract 112 3,891
 Census Tract 113 (part)
 Blue Township (part)
 Independence (part)
 Block Group 1 (part)
 Blocks 102-109 1,475
 Block Group 2 1,391
 Block Group 3 542
 Census Tract 114.01 (part)
 Blue Township (part)
 Independence (part)
 Block Group 1 (part)
 Blocks 104-114 984
 Blocks 118-130 1,764
 Census Tract 114.03 (part)
 Blue Township (part)
 Independence (part)
 Block Group 3 (part)
 Blocks 310-311 176
 Census Tract 115 6,614
 Census Tract 116 5,824
 Census Tract 117 4,926
 Census Tract 118 5,638
 Census Tract 119 4,141
 Census Tract 120 3,776
 Census Tract 121 6,387
 Census Tract 122 6,380
 Census Tract 123 3,533
 Census Tract 124 4,401
 Census Tract 125.01 3,724
 Census Tract 125.02 3,079
 Census Tract 125.03 3,140
 Census Tract 126 5,197
 Census Tract 127.01 7,344
 Census Tract 127.02 636
 Census Tract 128.01 8,713
 Census Tract 128.02 3,371
 Census Tract 129.01 7,263
 Census Tract 129.02 5,406
 Census Tract 130.01 88
 Census Tract 130.02 2,266
 Census Tract 130.03 5,028
 Census Tract 131 3,582
 Census Tract 132.01 7,451

*943
 Census Tract 132.02 3,011
 Census Tract 133.01 4,404
 Census Tract 133.02 7,751
 Census Tract 133.03 5,168
 Census Tract 134.01 3,065
 Census Tract 134.02 5,629
 Census Tract 134.04 113
 Census Tract 134.05 1,369
 Census Tract 134.06 4,146
 Census Tract 135 (part)
 Prairie Township (part)
 Greenwood 1,315
 Lee's Summitt (part) 1,743
 Washington Township (part) 212
 Census Tract 136 4,917
 Census Tract 137.01 1,078
 Census Tract 137.02 3,440
 Census Tract 137.03 5,266
 Census Tract 137.04 3,985
 Census Tract 142.01 3,335
 Census Tract 143 3,091
 Census Tract 144 1,704
 Census Tract 145 (part)
 Blue Township (part)
 Independence (part)
 Block Group 1 2,637
 Block Group 9 (part)
 Blocks 902-906 103
 Blocks 911-917 726
 Blocks 987-989 1,038
 Brooking Township (part)
 Kansas City (part) 28
 Census Tract 146.01 6,486
 Census Tract 146.02 7,197
 Census Tract 151 (part)
 Blue Township (part)
 Independence (part)
 Block Group 1 0
 Sugar Creek (part)
 Block Group 9 (part)
 Block 915 0
 Blocks 919-920 16
 Blocks 925-926 7
 Remainder of Township (part)
 Block Group 9 (part)
 Block 925 4
 Blocks 955-956 2
 _
TOTAL 546,882

CONGRESSIONAL DISTRICT NUMBER 6
Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

 1980
 POPULATION
Andrew County 13,980
Atchison County 8,605
Buchanan County 87,888
Caldwell County 8,660
Carroll County 12,131
Chariton County 10,489
Clay County 136,488
Clinton County 15,916
Cooper County 14,643
Daviess County 8,905
DeKalb County 8,222
Gentry County 7,887
Grundy County 11,959
Harrison County 9,890
Holt County 6,882
Howard County 10,008
Jackson County (part)
 Census Tract 150 (part)
 Blue Township (part) 240
 Fort Osage Township (part)
 Sibley 382
 Remainder of Township 1,373
Linn County 15,495
Livingston County 15,739
Mercer County 4,685
Nodaway County 21,996
Platte County 46,341
Putnam County 6,092
Ray County 21,378
Saline County 24,919
Schuyler County 4,979
Sullivan County 7,434
Worth County 3,008
 _____
TOTAL 546,614

CONGRESSIONAL DISTRICT NUMBER 7
Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

 1980
 POPULATION
Barry County 24,408
Cedar County 11,894
Christian County 22,402
Dade County 7,383
Dallas County 12,096
Douglas County 11,594
Greene County 185,302
Jasper County 86,958
Lawrence County 28,973
McDonald County 14,917
Newton County 40,555
Ozark County 7,961
Polk County 18,822

*944
Stone County 15,587
Taney County 20,467
Webster County 20,414
Wright County 16,188
 _______
TOTAL 545,921

CONGRESSIONAL DISTRICT NUMBER 8
Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

 1980
 POPULATION
Bollinger County 10,301
Butler County 37,693
Cape Girardeau County 58,837
Carter County 5,428
Crawford County 18,300
Dent County 14,517
Dunklin County 36,324
Franklin County (part)
 Census Tract 8011 6,514
Howell County 28,807
Iron County 11,084
Madison County 10,725
Mississippi County 15,726
New Madrid County 22,945
Oregon County 10,238
Pemiscot County 24,987
Perry County 16,784
Phelps County 33,633
Reynolds County 7,230
Ripley County 12,458
St. Francois County 42,600
Ste. Genevieve County 15,180
Scott County 39,647
Shannon County 7,885
Stoddard County 29,009
Washington County 17,983
Wayne County 11,277
 _______
TOTAL 546,112

CONGRESSIONAL DISTRICT NUMBER 9
Comprised of the following counties, townships, places, census tracts, block groups, blocks, and/or enumeration districts:

 1980
 POPULATION
Adair County 24,870
Audrain County 26,458
Boone County 100,376
Callaway County 32,252
Clark County 8,493
Franklin County (part)
 Census Tract 8001 5,495
 Census Tract 8002 6,731
 Census Tract 8003 6,131
 Census Tract 8004 8,743
 Census Tract 8005 5,407
 Census Tract 8006 9,105
 Census Tract 8007 7,883
 Census Tract 8008 5,417
 Census Tract 8009 7,182
 Census Tract 8010 2,625
Gasconade County 13,181
Knox County 5,508
Lewis County 10,901
Lincoln County 22,193
Macon County 16,313
Marion County 28,638
Monroe County 9,716
Montgomery County 11,537
Osage County 12,014
Pike County 17,568
Ralls County 8,911
Randolph County 25,460
St. Charles County (part)
 Census Tract 3101 4,364
 Census Tract 3111 16,045
 Census Tract 3113 11,325
 Census Tract 3114 7,050
 Census Tract 3115 729
 Census Tract 3116 4,380
 Census Tract 3117 8,711
 Census Tract 3118 5,153
 Census Tract 3119 6,521
 Census Tract 3120 4,192
 Census Tract 3121 4,464
 Census Tract 3122 5,988
Scotland County 5,415
Shelby County 7,826
Warren County 14,900
 _______
TOTAL 546,171

*945
*946
*947
WANGELIN, Chief District Judge, dissenting.
I respectfully dissent;
The 1980 census revealed that Missouri's population growth failed to keep up with national population growth and consequently Missouri's Congressional delegation was reduced from ten seats to nine. This failure to keep up with national population growth, and in some areas the actual decline in population, was most pronounced in the presently constituted first, second and third districts. I cannot concur with a redistricting plan that rewards areas for loss of population at the expense of areas that have not suffered such dramatic demographic declines. Rather, I would adopt the provisions of the First Extraordinary Session Senate Substitute for Senate Committee *948 Substitute for House Bill No. 1 [hereinafter the Plan], which is substantially the same as the Dirk Plan offered in the regular session, for the following reasons.
First, the Plan comports with the law as laid down in Preisler v. Secretary of Missouri, 341 F.Supp. 1158 (W.D.Mo.1972), and gives consideration to the salvageable portions of the districts created by that decision.
Second, the Plan splits only St. Louis and Jackson Counties[1] and does not split the City of St. Louis. The majority plan not only splits these two counties and others, but also divides the City of St. Louisan area which has lost population and does not contain the requisite population to constitute even one congressional district. Efforts to give voters in the City of St. Louis input in representation of other areas in more than one district would amount to rewarding the City for its population decline.
The suggestion that St. Charles and Jefferson Counties are part of the St. Louis metropolitan area and should therefore be drawn into overwhelmingly urban districts ignores the fact that population increases in those counties were primarily the result of popular flight from the "St. Louis metropolitan area."
To award multiple representation to the City of St. Louis and one-third of Missouri's congressional delegation to the "St. Louis metropolitan area," is not only unjust political compensation for an area of dwindling population but confounds the principles of representative government and the common sense application of the legal precepts which bind this panel.
The first district shall be composed of all of St. Louis City and the following United States Census Tracts in St. Louis County: Nos. 2199, 2200, 2139, 2140, 2138, 2204.02, 2204.04, 2203, 2205, 2206.02, 2201 and 2202. Total population543,314.
The second district shall be composed of the following United States Census Tracts in St. Louis County: Nos. 2106, 2105, 2118, 2119, 2104, 2120, 2121, 2122, 2123, 2124, 2125, 2117, 2116, 2115, 2126, 2129, 2128, 2127, 2137, 2136, 2135, 2134, 2130, 2114.02, 2131.01, 2133, 2114.01, 2131.02, 2151.01, 2151.04, 2132.01, 2132.02, 2150.01, 2151.03, 2151.02, 2150.03, 2150.02, 2153.01, 2152.01, 2153.02, 2148, 2149, 2147, 2146, 2144, 2145, 2143, 2159, 2157, 2156, 2155, 2154, 2165, 2158, 2162, 2164, 2163, 2161, 2160, 2141, 2142, 2168, 2169, 2170, 2191, 2171, 2172, 2167, 2166, 2173, 2102, 2103, 2109.03, 2110, 2111, 2112, 2182, 2180.02, 2181, 2189, 2174, 2175, 2188, 2187, 2186, 2185, 2184, 2176, 2177.01, 2180.01, 2183 and 2190. Total population 543,053.
The third district shall be composed of the following counties: Jefferson, Ste. Genevieve, St. Francois, Perry, Madison, Iron, Bollinger, Cape Girardeau, Scott, Stoddard, Wayne, Carter, Ripley, Butler, Dunklin, Pemiscot, New Madrid, and Mississippi. Total Population547,819.
The fourth district shall be composed of the townships of Fort Osage, Sni-A-Bar, Van Buren, and Prairie in Jackson County, and the counties of Ray, Lafayette, Saline, Howard, Boone, Cooper, Pettis, Johnson, Cass, Bates, Henry, Benton, Morgan, Moniteau, Camden, Hickory, St. Clair, Vernon, and Barton. Total Population548,028.
The fifth district shall be composed of the Jackson County Townships of Kaw, Blue, Brooking, and Washington. Total Population 548,520.
The sixth district shall be composed of the following counties: Atchison, Nodaway, Worth, Harrison, Mercer, Putnam, Schuyler, Scotland, Adair, Sullivan, Grundy, Daviess, DeKalb, Gentry, Andrew, Holt, Buchanan, Clinton, Caldwell, Livingston, Chariton, Linn, Macon, Randolph, Carroll, Clay, and Platte. Total Population545,729.
The seventh district shall be composed of the following counties: Cedar, Polk, Dallas, Wright, Webster, Greene, Dade, Jasper, Lawrence, Christian, Douglas, Ozark, Taney, Stone, Barry, McDonald, and Newton. Total Population545,921.
*949 The eighth district shall be composed of the following United States Census Tracts in St. Louis County: Nos. 2215, 2214.02, 2214.01, 2213.03, 2204.03, 2197, 2198, 2210, 2209, 2194, 2195, 2196, 2193, 2192, 2211, 2212.01, 2212.02, 2208.03, 2208.02, 2207.03, 2207.02, 2207.01, 2206.01, 2208.01, 2213.01, 2213.02, and the counties of Cole, Osage, Gasconade, Franklin, Miller, Maries, Washington, Crawford, Phelps, Pulaski, Dent, Laclede, Taxas, Shannon, Reynolds, Howell, and Oregon. Total Population549,459.
The ninth district shall be composed of the following United States Census Tracts in St. Louis County: Nos. 2113.02, 2113.01, 2113.03, 2109.02, 2109.01, 2108.02, 2108.03, 2108.04, 2107, 2101, 2216, 2151.05, 2152.03, 2178.05, 2178.04, 2177.02, 2152.02, 2179.02, 2179.03, 2179.04, 2178.06, 2178.07, 2178.02, and the following counties: Clark, Lewis, Knox, Shelby, Marion, Monroe, Ralls, Pike, Audrain, Callaway, Montgomery, Lincoln, Warren, and St. Charles. Total Population 545,601.
 *950 *951
NOTES
[1] Section 2c was attached as a rider to a private immigration bill. Act of December 14, 1967, Pub.L.No.90-196, 81 Stat. 581.
[2] For the entire floor debate, see 113 Cong.Rec. 31718-20, 34032-39, 34364-70 (1967).
[3] The Court has put state legislature apportionment schemes to a less exacting scrutiny. The unconstitutionality of population variances in state legislative districts is based on the equal protection clause of the Fourteenth Amendment, not Art. I, § 2. See, e.g., White v. Regester, 412 U.S. 755, 763, 93 S.Ct. 2332, 2338, 37 L.Ed.2d 314 (1973).
[4] We note that the finding by the Preisler Court, that proffered justifications for population deviation were inadequate, did not imply that these considerations were illegitimate. The Court did not suggest that political subdivisions or economic and social interests cannot be considered; rather, these factors must be secondary to population equality.
[5] The demographers of the State of Missouri Office of Administration, Division of Budget and Planning, and in particular Mark R. Reading, Project Director for Reapportionment, and T. Ryan Burson, Planner.

We are indebted to these gentlemen and the state agency they represent for their technical assistance in checking the population figures of the 1980 decennial census and the boundary locations of the various districts.
[6] In City of Mobile, the plaintiffs alleged that Mobile's at-large elections with multi-member districts for city commissioners prevented the election of blacks. We can discern no reason why discriminatory impact would make out a constitutional violation in the context of congressional apportionment.
[7] In the instant case, there is no danger of cancelling out white voting strength. If one black-majority district were drawn, it would give 11.1 percent of the Missouri congressional districts a black majority. Blacks comprise 10.5 percent and all nonwhites comprise 11.6 percent of the Missouri population. A comparison of the percentage of black-majority districts to the percentage of the black population is a proper way of determining whether use of racial criteria has cancelled out a group's voting strength. See United Jewish Organizations v. Carey, 430 U.S. at 166, 97 S.Ct. at 1010.
[8] Justices Brennan and Blackmun felt that a racial criterion in U. J. O. was permissible because of the applicability of the Voting Rights Act of 1965. They joined the part of Justice White's opinion relying on the Voting Rights Act, 430 U.S. at 155-65, 97 S.Ct. at 1004-09, but they did not join the part which said that race could be considered absent the Act. Id. at 168-79, 97 S.Ct. at 1011-17 (Brennan, J., concurring). Justice Marshall took no part in the case, and Chief Justice Burger was the lone dissenter.
[9] The requirement of population equality is subsumed in the requirement of the United States Constitution.
[10] The population of the five counties in the Missouri portion of the Census Bureau's Standard Metropolitan Statistical Area for Kansas City is 884,502, which is more than enough for one district.
[11] The population of the five counties in the Missouri portion of the Census Bureau's Standard Metropolitan Statistical Area for St. Louis is 1,788,504, while 1,638,894 people are needed to completely fill three districts. One of the counties in the SMSA, Franklin County, is not included in any of the St. Louis area districts.
[12] The court did, however, base its plan on one which had been enacted by the legislature but was found unconstitutional. Preisler v. Secretary of State, 341 F.Supp. at 1161.
[13] It is ironic that the dissent bases its plan on a desire to salvage the present districts, p. 948, par. 1, post, but it does not salvage that part of the plan which divides the City of St. Louis.
[1] These are the only two counties in Missouri that must be split since their individual population exceeds the population total necessary (546,298) to make one congressional district.